[No. 15425-1-II.   Division Two.   February 23, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. TIM
DALTON, *Appellant*.

*Robert H. Gombiner* and *Nance, Iaria & Gombiner*, for appellant.

*Nelson E. Hunt, Prosecuting Attorney*, and *Douglas E. Jensen, Deputy*, for respondent.

ALEXANDER, J. — Tim Dalton appeals his conviction on a charge of unlawful manufacture of marijuana. He asserts that the trial court erred in denying his motion to suppress evidence seized from his residence pursuant to a search warrant, contending that there was insufficient probable cause to justify issuance of the warrant. We reverse.

On October 31, 1990, the Lewis County Unified Narcotics Enforcement Team (UNET) received a telephone call from an anonymous caller who stated that a person named Tim Dalton was involved in methamphetamine sales and distribution in the Lewis County area. The caller gave UNET Dalton's telephone number and stated that Dalton had three associates, one of whom lived in Alaska.

Nearly 4 months later, another anonymous call was received by the Washington State Patrol in Vancouver. The

134

caller, who sounded like a woman, reported that Dalton would be transporting 16 pounds of marijuana to Alaska via Alaska Airlines on February 14 or 15. She also gave the State Patrol Dalton's home address in Winlock and a telephone number for Dalton that was the same as that given by the earlier caller to UNET. The State Patrol reported the substance of this call to UNET.

Lewis County Sheriff Deputy Tim Tingle was serving on the UNET task force when the State Patrol informed it of the call it had received about Dalton. Tingle then commenced an investigation of Dalton. His investigation confirmed that Dalton lived at the same address as that reported by the second informant (and that Dalton's telephone number corresponded to that attributed to him by both callers). Tingle also determined that Dalton had an Alaska driver's license and post office boxes in two Alaska cities. In addition, Tingle contacted Alaska Airlines and confirmed that Dalton had booked passage on a flight that was scheduled to depart from SeaTac Airport for Alaska on February 14, 1991. Alaska Airlines informed Tingle that Dalton was a frequent flier with over 100,000 miles.

On February 14, 1991, UNET members attempted to follow Dalton when he left his home in Winlock, ostensibly for the airport. They lost contact with him, however, and he apparently never arrived at SeaTac Airport to board a flight. That same day, UNET personnel and Lewis County Sheriff deputies flew over Dalton's residence and photographed the premises. Their observations and photographs did not reveal that any illegal activities were taking place at the residence.

On February 26, 1991, the Federal Drug Enforcement Agency (DEA) office in Seattle received a call from an anonymous female who stated that Dalton would be shipping marijuana by mail to Juneau, Alaska, later that same day. The caller indicated that Dalton would then board a flight from SeaTac to Alaska. After the UNET task force was notified of the call by the DEA, UNET members traveled to SeaTac Airport where they located Dalton in the

Alaska Airlines ticketing area. After Dalton checked his luggage, UNET members detained it and called in a "certified drug dog" who, after smelling the luggage, gave indications that controlled substances were present within the luggage. A search of the luggage, conducted pursuant to Dalton's consent, however, revealed no controlled substances. Dalton did not board a flight from SeaTac Airport that day.

On February 27, 1991, UNET learned that Dalton was scheduled to depart from SeaTac for Alaska that morning. It also learned that the United States Post Office in Seattle had received a package addressed to Dalton's post office box in Alaska. The package contained a return address: "Dan Wilson, Federal Way". After obtaining a search warrant, a postal inspector examined the package and confiscated approximately 8 pounds of marijuana that was found in the package.

Tingle then presented an affidavit containing facts, generally consistent with what is set forth above, to a Lewis County District Court judge. On February 28, 1991, the district court judge issued a search warrant authorizing a search of Dalton's "residence, vehicles, garage, and/or any unattached buildings" for evidence connecting Dalton to "delivery of marijuana". UNET team members executed the warrant the following day and seized marijuana plants, drug paraphernalia, and drug related paperwork from Dalton's residence, garage, and an outbuilding. They also seized several pounds of marijuana from a car registered to another person that was parked on Dalton's property. Dalton was subsequently charged in Lewis County Superior Court, pursuant to RCW 69.50.401(a), with unlawful manufacture of marijuana.

A suppression hearing was conducted before trial. Dalton contended, in support of his motion to suppress all evidence obtained from the search of his premises, that the affidavit for search warrant did not establish probable cause to believe that the evidence sought would be found in his residence, outbuilding, or vehicles on the property.

The trial court denied his motion, stating that "probable cause [exists] to conclude that [Dalton] was a participant in the illegal shipment of eight pounds of marijuana" and that "[t]here is probable cause to conclude that a dealer of marijuana would have evidence to that crime in his residence, vehicles and outbuildings". Thereafter, based on stipulated facts, the trial court found Dalton guilty of the charge.

Dalton contends that the search of his house violated both the Fourth Amendment and Washington's Constitution, article 1, section 7.[1] Specifically, he argues that the search warrant should not have issued because the affidavit presented in support of the warrant did not provide a basis for a reasonable person to conclude that the evidence sought would be found at the place to be searched.

A judge's determination that probable cause exists to issue a search warrant deserves great deference on appeal and doubts should be resolved in favor of the warrant's validity. *State v. J-R Distribs., Inc.*, 111 Wn.2d 764, 774, 765 P.2d 281 (1988); *State v. Jackson*, 102 Wn.2d 432, 442, 688 P.2d 136 (1984). A judge's finding that probable cause exists is reviewed under an abuse of discretion standard. *State v. Remboldt*, 64 Wn. App. 505, 509, 827 P.2d 282, *review denied*, 119 Wn.2d 1005 (1992).

This court examines the information available to the issuing judge when determining whether there was probable cause for issuance of the warrant. *State v. Murray*, 110 Wn.2d 706, 709-10, 757 P.2d 487 (1988). Probable cause is established if the affidavit in support of the warrant sets forth facts sufficient for a reasonable person to conclude that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched. *State v. Perrone*, 119 Wn.2d 538, 551, 834 P.2d

[1]Although Dalton made reference in his brief to the Washington Constitution, he has not engaged in the required *Gunwall* analysis, *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986), and, therefore, we need not address the issue. *Margola Assocs. v. Seattle*, 121 Wn.2d 625, 642 n.6, 854 P.2d 23 (1993).

611 (1992); *State v. Maxwell*, 114 Wn.2d 761, 769, 791 P.2d 223 (1990); *State v. Garcia*, 63 Wn. App. 868, 871, 824 P.2d 1220 (1992). The affidavit in support of the search warrant must adequately show circumstances that extend beyond suspicion and mere personal belief that evidence of a crime will be found on the premises to be searched. *State v. Seagull*, 95 Wn.2d 898, 907, 632 P.2d 44 (1981); *State v. Rangitsch*, 40 Wn. App. 771, 780, 700 P.2d 382 (1985). "This is not to suggest, however, that the information linking the things to be seized with criminal activity must always be of the direct sort or that reasonable inferences cannot be drawn from the surrounding circumstances". *Garcia*, 63 Wn. App. at 873 (citing 2 Wayne R. LaFave, *Search and Seizure* § 3.7(d), at 102 (2d ed. 1987)). If probable cause is not established by informant information, it may be established through independent investigation by the police. "The investigation must point to suspicious activities or indications of criminal activity along the lines suggested by the informant." *Maxwell*, 114 Wn.2d at 769.

In arguing that the warrant failed to provide a basis for concluding that the evidence sought would probably be at his home, Dalton attempts to distinguish a case relied on by the State, *State v. Gross*, 57 Wn. App. 549, 789 P.2d 317, *review denied*, 115 Wn.2d 1014 (1990). In *Gross*, Federal Express employees noticed a "suspicious" package destined for Wisconsin which was similar to a package they had found earlier that week containing controlled substances. The package was strongly scented and it was sealed at every seam with duct tape. The return address on the package "appeared to be false". The Federal Express employees notified the Bellingham police who then summoned a canine unit. After that unit's dog indicated the presence of controlled substances, the package was opened. It was found to contain six half-pound bags of marijuana as well as "a foil package of finger hash, and a letter addressed to 'John and Cherrie' signed 'Cliff' ". (Footnote omitted.) *Gross*, at 552. The letter stated that "future packages would be sent less frequently but in larger quantities" and that the

sender preferred checks, not cash, that the mail would no longer be used because it was too dangerous, and that the sender suspected his phone was tapped. *Gross*, at 552. Following discovery of the package of marijuana, the person named "Cherrie" informed the Bellingham Police that Cliff's last name was Gross. She also gave them Gross's street address. After the police confirmed that Cliff Gross lived at the address given to them by Cherrie, they obtained a warrant to search Gross's residence.

Gross challenged the search, citing *Rangitsch*, 40 Wn. App. at 780, for the proposition that "police may not search the home of a habitual drug user based on 'mere speculation' that drugs and paraphernalia will be found there." *Gross*, at 553. In denying Gross's motion to suppress, the court in *Gross* distinguished *Rangitsch* on the basis that Gross was a drug trafficker while the defendant in *Rangitsch* was merely a drug user. It said:

> (1) drug trafficking is a much greater evil than drug use, increasing the governmental justification to search, and (2) if the homes of drug users could be searched as readily as the homes of drug traffickers, a much greater invasion of privacy would result.

*Gross*, 57 Wn. App. at 553. The court also cited *United States v. Dubrofsky*, 581 F.2d 208, 212-13 (9th Cir. 1978), which approved a search pursuant to a warrant, notwithstanding the lack of connection between the drug trafficking and the residence because "[h]eroin importers commonly have heroin and related paraphernalia where they live." *Gross*, at 554 (quoting *Dubrofsky*, at 213). It said:

> [A] warrant may be upheld when the nexus between the items to be seized and the place to be searched rests not upon direct observation, but on the type of crime, nature of the items, and normal inferences where a criminal would likely hide contraband.

*Gross*, at 554 (quoting *Dubrofsky*, at 213). The court in *Gross* also quoted *United States v. Freeman*, 685 F.2d 942, *reh'g denied*, 689 F.2d 190 (5th Cir. 1982), as follows:

> [W]e can connect business records and cocaine to [the defendant's] house because [the defendant] was engaged in an ongo-

ing drug smuggling operation and the most likely base of operations is his house. . . . "[F]ew places are more convenient for use in planning criminal activities and hiding fruits of a crime" than [one's] home . . ..

(Citation omitted.) *Freeman,* at 950 (quoting *United States v. Green,* 634 F.2d 222, 226 (5th Cir. 1981)).

■ For several reasons, we do not believe that *Gross* controls the outcome here. First, even assuming that the home of a drug trafficker is to be accorded less privacy than the home of a drug user, we are not satisfied that the affiant set forth sufficient facts in his affidavit to establish that Dalton was probably a drug trafficker or drug smuggler. Even granting the magistrate's determination of probable cause due deference, it is readily apparent that there is nothing in the affidavit, other than the unconfirmed statements of the unidentified informants, to indicate that Dalton was selling or delivering controlled substances to others. The most that can be said is that a package of marijuana bearing a return address of "Dan Wilson, Federal Way" was addressed to Dalton's post office box in Alaska, and that three unidentified informants indicated that Dalton was involved in distributing controlled substances. The latter information is of almost no value, because, except for innocuous details, there was no corroboration of these informants' tips. Indeed, all investigation following receipt of the anonymous tips (*i.e.,* the flyover of Dalton's residence and the search of his luggage at SeaTac Airport) disclosed no incriminating evidence. Furthermore, none of the information provided to the magistrate tied Dalton's home to controlled substances. This is unlike *Gross,* where a letter was found in the package of controlled substances, indicating that the dealer thought his phone was tapped and that he wanted payment in check. It was reasonable for the court in *Gross* to infer from this letter, as it did, that Gross "was referring to his home phone" and that the check would presumably, be sent through the mail because "[m]ail is one of those items that people normally receive and keep at

their places of residence." (Citation omitted.) *Gross*, 57 Wn. App. at 554 (quoting *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977)).

Here, though, there was no evidence from which an inference could be made that drugs could be found at Dalton's home. As previously noted, an aerial surveillance of Dalton's property and a search of his luggage on February 27, 1991, revealed nothing. Furthermore, the return address on the package indicated that another person, who lived in Federal Way, had sent the marijuana to Alaska, not Dalton. While one could reasonably infer that Dalton might be the recipient of the marijuana in Alaska, it does not follow that he was dealing drugs, particularly from his home in Winlock.

In short, the information provided to the magistrate was insufficient to support a conclusion that Dalton was probably engaged in ongoing drug trafficking or that criminal activity was or had occurred at or around Dalton's residence.[2] While he may have been about to possess drugs in Alaska,[3] "[p]robable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home." *Commonwealth v. Kline*, 234 Pa. Super. 12, 17, 335 A.2d 361, 364 (1975). A generous view of the information provided to the magistrate creates much suspicion about Dalton. It was, however, insufficient to justify issuance of a search warrant for Dalton's house. We reach the same conclusion as to the search of the outbuilding, garage, and the automobile located on or around his residence. Consequently, the trial court erred in not suppressing the evidence seized pursuant to the warrant.

[2]*See also Commonwealth v. Kline*, 234 Pa. Super. 12, 17, 335 A.2d 361, 364 (1975) (there must be additional facts to support the inference that the supply is probably located at a residence, such as evidence that the seller went to his home prior to the sale or that the sale took place near his home).

[3]We note that under Alaska law it was not unlawful to possess small amounts of marijuana for personal use before March 3, 1991. *See* former Alaska Stat. § 11.71.060(a)(4).

Reversed.

MORGAN, C.J., and HOUGHTON, J., concur.